COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
 2-05-069-CV

 

 

THE BURLINGTON NORTHERN                                               APPELLANT

AND
SANTA FE RAILWAY COMPANY

 

                                                   V.

 

LYNDEN AIR FREIGHT D/B/A                                                    APPELLEE

SKYTRACK

 

                                              ------------

 

            FROM
THE 67TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction








In two issues, the Burlington
Northern and Santa Fe Railway Company (ABNSF@) asserts
that the trial court erred by (1) granting the motion for summary judgement
filed by Lynden Air Freight d/b/a Skytrack and denying BNSF=s corresponding motion and, alternatively, (2) failing to find that a
contractual ambiguity created a fact question to be determined by the trier of
fact.  We reverse and remand.

II. Background

In 2001, BNSF was exploring
ways that it could more efficiently transport goods it purchased for its own
use from one location to another.  An
example posited by BNSF is air filters purchased in Baltimore for use in
Barstow, California, that needed to be transported, from Baltimore to
California.  Under the then-existing
system, a contracted trucking company would simply ship the air filters for
BNSF either TL (truckload) or LTL (less than truckload).

BNSF issued a Arequest for proposal@ to several companies for a cheaper way to inventory, warehouse, and
distribute such items, including an estimated savings to BNSF from the
responding companies.  Skytrack responded
with a proposal that would Areduce BNSF=s overall
hard costs at least 30% over direct LTL/TL services@ and anticipated A[s]ubstantially reduced LTL, [TL], air freight, and expedited transportation
charges B overall estimated savings of at least 30%.@








According to BNSF, Skytrack=s proposal would work thusly:  Skytrack
would arrange for local cartage, regional LTL, or other contracted service to
transport the air filters from the supplier in Baltimore to a centrally located
ASkytrack Consolidation Center,@ for example, in Chicago. 
Skytrack would then consolidate those materials with materials that BNSF
had purchased from other suppliers bound for the same regional destination,
place the consolidated goods on a trailer, and then transport the consolidated
material via another cartage company retained by Skytrack from the
consolidation center to a railroad terminal. 
The trailer would then be loaded on one of BNSF=s own trains and transported to another Skytrack consolidation center
located nearer the point of use, for example, in Los Angeles.  Skytrack would then unload the trailer and
sort the goods for delivery to various final end-use destinations, like the air
filters for Barstow.  The final delivery
to Barstow would be made by Skytrack through its use of third-party local
cartage, regional LTL, or other contracted services.








Skytrack=s explanation of their proposal is similar:  instead of having BNSF pay for the air
filters to be transported separately LTL from point of shipment, Baltimore, to
point of delivery, Barstow, BNSF would pay for the goods to be trucked to a
consolidation center, Chicago, run by Skytrack. 
Skytrack would then consolidate the air filters into a single trailer,
if possible, along with other BNSF goods destined for the same geographical
area.  This trailer of consolidated
freight would next be loaded on BNSF=s own flat cars (called AIntermodal@ or Trailer
On Flat Car (TOFC)) to be transported by train to another Skytrack
consolidation center, say Los Angeles, near its destination, Barstow.  Skytrack would then arrange for final
delivery, for which it invoiced BNSF.

After negotiations, BNSF and
Skytrack entered into a contract, effective August 8, 2001, regarding Skytrack=s proposal.  Under the contract,
Skytrack charged BNSF for five different services, set forth in Exhibit A to
the contract: (1) a Aterminal
service charge@ at the
initial consolidation center to consolidate into trailers the separate cargoes
that arrived there; (2) Adrayage@ to move the trailers from the Skytrack consolidation center to the
nearest BNSF terminal, where it was loaded for TOFC transportation on BNSF=s flatcars, and then from the BNSF terminal to the Skytrack center for
deconsolidation; (3) Acartage,@ also called Apickup and
delivery,@ to
transport the goods after they were deconsolidated for delivery to their
destination; (4) Aline haul@ charges for particularly long cartage; and (5) Amiscellaneous@ and hourly
charges such as hosling (or hosteling). 
These were all of Skytrack=s charges to BNSF.  Skytrack
asserts that these were AContractor
actual charges@ as provided
by the contract.








Skytrack asserts that it did
not charge BNSF for any initial transportation to a Skytrack consolidation
center performed by an LTL carrier, as the contract did not allow for it.  Those LTL costs were ABNSF fees@ charged by
LTL carriers directly to, and paid directly by, BNSF.  In addition, for any TOFC transportation
segment, Skytrack alleges that those costs were borne or incurred solely by
BNSF: the contract did not allow Skytrack to charge for TOFC costs.

The first paragraph of the
contract identifies the parties.  It
reads as follows:

THIS AGREEMENT is made and entered into as of
August 8, 2001, the AEffective
Date@, by
and between THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, a Delaware
corporation (hereinafter ABNSF@ or
the ARailroad@);
and LYNDEN AIR FREIGHT, INC., a Washington corporation, dba SkyTrack, (hereinafter
ASkyTrack@ or
the AContractor@).  (Emphasis supplied.)

 

Another paragraph, proposed by Skytrack and
accepted by BNSF, addressed the promised savings:

The
methodology for computing historical BNSF costs and expenses, for purposes of
comparison with Actual CONTRACTOR Charges, shall be mutually developed and
agreed upon.  In this connection,
CONTRACTOR guarantees that BNSF total CONTRACTOR actual charges will be
at least 25% less than BNSF Historical total costs and expenses would have been
for movement of identical materials and volumes utilizing any other services. .
. .  In addition, Skytrack
and BNSF will jointly develop quality performance measurements and review
results on a quarterly basis. [Emphasis supplied.]

 








Using the previous example,
under the contract as entered into by the parties, Skytrack would arrange for
an air filter to be transported from Baltimore by carrier to a Skytrack
consolidation center in Chicago, where it would be consolidated with other items
moving to a similar location as the air filter, and then transport the items by
rail to another closer-to-destination consolidation center in Los Angeles,
where it would again be transported by carrier to its final destination in
Barstow.  Initially, the third-party
carriers were paid by Skytrack and then the costs were passed to BNSF, but
later BNSF paid these third-party carriers directly.

Skytrack had wanted a
guaranteed minimum amount of freight, but BNSF would only provide historical
data on the amount of freight involved. 
For comparison purposes, transportation costs were agreed to
historically have been $11.60 cwt (per hundred weight).  Skytrack asserts that, based on its
experience, it felt that it could meet the 25% savings goal based on the $11.60
figure, even without a volume guarantee, based on the assumption that it was
guaranteeing that only its own costs would be 25% less than corresponding
previous costs because it could not control costs other than its own.

Problems arose as to whether
the savings expected by BNSF were being achieved.  Skytrack asserts that the historical volumes
provided as a benchmark by BNSF were never met.  BNSF asserts that Skytrack=s own calculations showed that the promised savings did not
occur.  BNSF subsequently demanded a
refund of $843,078.01 for the period of January 1CSeptember 30, 2002, invoking the remedy clause in the contract, which
reads as follows:








In
the event CONTRACTOR total actual charges are not at least 25% lower than
similar Historical BNSF total average costs and expenses, CONTRACTOR will
refund BNSF an amount equivalent to the net deficit or a full refund of
CONTRACTOR charges for the period examined (whichever is less) within 30 days
following completion of comparison, or BNSF may, at its option, cancel the
remaining term of the agreement without further obligation.

 

Skytrack asserts that this demand was sent
despite the fact that the parties had agreed to come to mutually acceptable
methods of calculating savings after the types of shipments and volumes had
become established, which methodology had never been agreed upon.

Skytrack responded to the
demand by letter of October 20, 2002, informing BNSF that it had already saved
BNSF hundreds of thousands of dollars because the charges to BNSF from Skytrack
were $4.09 cwt, much lower than the historical cost of $11.60 cwt.  Negotiations failed, and on February 24,
2003, BNSF cancelled the contract and asked for a refund of $1,166,217.  Litigation ensued.








After discovery, each party
filed a motion for summary judgment regarding the interpretation of the phrase ABNSF total contractor actual charges,@ each urging the same interpretation as in this appeal.  Skytrack also asserted that BNSF was barred
from seeking a refund because it had elected to cancel the contract, and BNSF
could not both cancel and be entitled to a refund under the terms of the
contract.  The trial court granted
Skytrack=s motion, finding that it had Aexceeded the requirements of the contract guarantee,@ and denied BNSF=s motion,
finding that BNSF was Aentitled to
no refund.@  This appeal by BNSF resulted.

III.  The Disputed Phraseology








As posited by BNSF, in
addition to the calculation of a refund, if warranted, Athe only issue[] in this case [is] interpretation of the phrase >BNSF total Contractor actual charges=@ because these charges, compared to the historical total costs and
expenses, were the basis for the guaranteed 25% savings, and hence were the
basis for determining whether Skytrack had met its contractual
obligations.  BNSF=s position is that this phrase includes all costs charged by
third-party contractors associated with the movement of BNSF goods through the
Skytrack system, whether billed to BNSF directly or through Skytrack.  In the example previously used, the charges
would be all expenses incurred in moving the air filter from Baltimore to
Barstow.  BNSF points to the following as
support for its position:  (1) the
purpose of the entire contract from its inception was to receive proposals to
reduce BNSF=s overall
shipping costs from origination (Baltimore in our example) to destination
(Barstow in our example), not only a portion of the total shipping costs; (2)
Skytrack used all third-party contractor costs in its post-contract reports to
BNSF, including various documents showing the savings ranging from a low of
9.2% to a high of 18.45%, and admitted that it was not meeting its 25%
cost-reduction goal, (3) the $11.60 cwt figure used by Skytrack for its
benchmark for historical savings comparisons included third-party contractor
expenses for origin-to-destination purposes; (4) the contractual language calls
for costs comparisons to the costs and expenses associated with the
transportation and distribution of similar materials and volumes, and (5)
the use of the word Atotal@ in the phrase Atotal
Contractor actual charges@ shows that
more than just Skytrack=s actual
charges was intended.








On the other hand, Skytrack=s position is that the phrase means only Skytrack=s actual charges and does not include third-party expenses.  In our ongoing example, under Skytrack=s view, the phrase would include only charges for the work done by
Skytrack after the air filters reached the consolidation centers.  Skytrack supports its position with the
following arguments:  (1) a literal
reading of the phrase Atotal
Contractor actual charges@ is Atotal Skytrack actual charges@ because the contract defines @Contractor@ as ASkytrack@; (2)
Skytrack has control over its costs and charges only, not over third-party
contractors, and could not guarantee savings from third-party charges; (3) the
contract was drafted with the language in question to protect Skytrack=s liability because BNSF would not guarantee a minimum volume of
freight; and (4) using this literal interpretation is the only way to make
other portions of the contract=s use of AContractor@ read in a sensible manner. 
Each party takes issue with the other party=s interpretation of the contractual phrase.

IV. Legal Analysis

A. Summary Judgment

In a summary judgment case,
the issue on appeal is whether the movant met the summary judgment burden by
establishing that no genuine issue of material fact exists and that the movant
is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); Sw.
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215.

When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant, and we
indulge every reasonable inference and resolve any doubts in the nonmovant's
favor.  Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  Evidence that favors the movant=s position will not be considered unless it is uncontroverted.  Great Am. Reserve Ins. Co. v. San Antonio
Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).








The summary judgment will be
affirmed only if the record establishes that the movant has conclusively proved
all essential elements of the movant=s cause of action or defense as a matter of law.  Clear Creek Basin, 589 S.W.2d at 678.

B. Ambiguity

A contract is ambiguous when
its meaning is uncertain and doubtful or if it is reasonably susceptible to
more than one interpretation.  Gutierrez
v. Elizondo, 139 S.W.3d 768, 775 (Tex. App.CCorpus Christi 2004, no pet.). 
Likewise, a contract is unambiguous if it can be given a definite or
certain legal meaning.  J.M. Davidson,
Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  A lack of clarity alone does not create an
ambiguity, nor does every difference in interpretation.  Universal Health Care Servs. Inc. v.
Renaissance Women=s Group P.A., 121 S.W.3d 742, 746 (Tex. 2003).  Rather, for an ambiguity to exist, both
competing interpretations of contractual language must be reasonable.  Lopez v. Munoz,
Hockema & Reed L.L.P., 22 S.W.3d 857, 861 (Tex. 2000).  If no ambiguity exists, disagreement over
interpretation of the contract will not make it ambiguous.  Gutierrez, 139 S.W.3d at 776.








The initial determination of
ambiguity is a legal question to be considered by the trial court, Lopez,
22 S.W.3d at 861, and is made by looking at the contract as a whole in light of
the circumstances present when the parties entered into the contract.  Columbia Gas Transmission Corp. v. New Ulm
Gas Ltd., 940 S.W.2d 587, 591 (Tex. 1996).  In construing a contract, a court=s primary concern is to ascertain and give effect to the intent of the
parties as expressed in the contract.  Lopez,
22 S.W.3d at 861.  Further, if a
contract is susceptible of two interpretations, one rendering it valid and one
invalid, construction validating it must prevail, and a reasonable
interpretation will be preferred to an unreasonable one.  Vincent v. Bank of Am., N.A., 109
S.W.3d 856, 867 (Tex. App.CDallas 2003, pet. denied).  And,
as would be expected, contractual language is construed in accordance with the
plain meaning of the language, unless it definitely appears from the writing as
a whole that the intention of the parties would be defeated by such a
procedure.  McEwin v. Allstate Tex.
Lloyds, 118 S.W.3d 811, 815 (Tex. App.CAmarillo 2003, no pet.).

V.  Application

Neither party appears to have
urged ambiguity at the trial court level. 
Nevertheless, this does not constrain our review of this issue.  See J.M. Davidson, 128
S.W.3d at 231.  Our determination of the
issue of ambiguity must precede the other issue because a finding of ambiguity
would preclude the ultimate initial relief sought by BNSFCconstruction of the phrase in question in its favor as a matter of
law.  BNSF opines that Aperhaps the contractual provision at issue here is not a model of
clarity.@  Indeed!  Perhaps if Jonah had stayed out of the water,
he would not have been swallowed.








Applying the foregoing
contractual construction principles, we conclude that the phrase in dispute is
ambiguous, being patently unclear and yet capable of two reasonable
interpretations.  A literal reading of
the phrase, AContractor
guarantees that BNSF total Contractor actual charges will be at least
25%,@ reveals that it is, at best, confusing.  Should ABNSF@ be read as
a possessive, ABNSF=s,@ referring
to the total Contractor actual charges of BNSF? 
Or should AContractor@ be in the possessive, AContractor=s,@ meaning the actual charges of Skytrack?  Because the actual words used are not in the
possessive case, do they intend to not refer to the language following
them?  The next sentence in the contract
uses the phrase AContractor
total actual charges.@  Is there a reason the word Atotal@ has been
moved?  What are Aactual@
charges?  What charges are not Aactual@?  Further, and more important, there are two
reasonable interpretations of the meaning of the phrase, as previously
discussed and as urged by the parties. 
Therefore, the trial court erred in finding the contract unambigous and
granting judgment in favor of Skytrack. 
BNSF=s first
issue is overruled, and their second issue is sustained.  Because of our disposition of these issues,
we do not reach Skytrack=s argument
regarding election of remedies.  See
Tex. R. App. P. 47.1.

 

 








VI. Conclusion

Having found error in the
judgment of the trial court, we remand this cause to the trial court for trial.

 

 

BOB MCCOY

JUSTICE

 

PANEL A:   CAYCE, C.J.; DAUPHINOT
and MCCOY, JJ.

DELIVERED: 
January 19, 2006











[1]See Tex. R. App. P. 47.4.